IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, Plaintiff, v. JASON NGUYEN, Defendant. | **MEMORANDUM DECISION AND ORDER** Case No. 2:09-cr-385 CW Judge Clark Waddoups |
|---|---|

## INTRODUCTION

Defendant Jason Nguyen ("Nguyen") moves the court to suppress all evidence seized during a search of a vehicle Nguyen was driving. A confidential informant ("C.I.") told Detective Brett Miller ("Miller") that Nguyen would have 1000 pills of ecstasy in a Chevy Avalanche. Later, the Chevy was stopped for a traffic violation. During the stop, Detective Michael Johnson ("Det. Johnson"), a Canine Officer, conducted an exterior sniff of the Avalanche with his drug dog. The dog alerted on the passenger side and then on the glove box. A subsequent search of the vehicle yielded 986 ecstasy pills. Nguyen moves to suppress the ecstasy on the ground that the search and seizure violated his Fourth Amendment rights because (1) the C.I.'s information was not sufficient to establish probable cause, (2) the driving violation did not provide a basis to search for contraband, (3) the investigatory detention was unjustified, (4) no controlled substances were in plain view, and (5) there was no evidence as to the canine's reliability, credibility and training in regards to ecstasy. The court concludes the search and seizure was reasonable, and therefore denies the motion to suppress.

## BACKGROUND

On November 6, 2008, Det. Miller, an eleven year veteran, received information from a C.I. that Nguyen was involved in selling ecstasy pills.[1] Det. Miller had worked with the C.I. for somewhere between a year and a half to three years prior to November 2008.[2] While they worked together, the C.I. provided reliable information that led to convictions on at least four occasions and, as far as Det. Miller knew, had never provided false information.[3] Furthermore, at the time of this incident, the C.I. was not working as a result of an arrest nor working off any charges, although he did have a criminal and drug history.[4]

The C.I. told Det. Miller that Nguyen drove a Chevy Avalanche ("Avalanche"), and, to make sure of the make and model, Det. Miller showed him a picture of an Avalanche.[5] In addition, Det. Miller showed the C.I. a picture of Nguyen to confirm they were talking about the same person.[6] The C.I. told Det. Miller that Nguyen agreed to sell him one thousand pills of ecstasy at the Salt Lake City Rose Park Area.[7] Det. Miller told the C.I. to order the pills, but not to show up at the location

---

[1] Hr'g Tr., 4:21-22 (Docket No. 15). Previously, Det. Miller had received similar information from a Deputy United States Marshall about Nguyen. *Id.* at 5:15-18.

[2] *Id.* at 11:19-20. The testimony was unclear about the exact time period.

[3] *Id.* at 12:2-3, 8-11; 18:1-4;

[4] *Id.* at 12:12-14; 12:22-13:1. The C.I. had previously worked off a charge, though once the charge was worked off, he started receiving compensation, typically $100-$200, for acting as an informant. *Id.* at 13:8-10;14:1-11.

[5] *Id.* at 4:26-5:12.

[6] *Id.* at 4:19-6:1.

[7] *Id.* at 6:23-25; 8:1-4.

of the buy because the police would not provide the money for the buy.[8] Det. Miller, partnered with Deputy United States Marshal Mark Thompson ("Dep. Thompson"), then proceeded to set up a containment area at the location of the buy and conduct surveillance.[9] The two officers located a White Chevy Avalanche matching the C.I.'s description and ran the vehicle's license plate number.[10] They discovered the Avalanche was registered to Nicole Nguyen at an address that had been used by Jason Nguyen.[11] Consequently, Det. Miller believed the car belonged to one of Nguyen's family members.[12] In addition, the officers discovered that the Avalanche's registration was revoked for lack of insurance.[13]

Once surveillance was in place, Det. Miller decided to minimize his role in the investigation because he had extra duties on the day of the buy and because he was concerned his involvement might reveal his C.I.'s identity.[14] As a result, Det. Miller contacted Det. Johnson, a Canine Officer, who agreed to be in the area with his narcotics dog.[15] Det. Miller also contacted Detective Michael Lewis Lynes ("Det. Lynes"), a ten year veteran, and asked him to take the lead in the investigation

---

[8] *Id.* at 15:9-13, 21-22.

[9] *Id.* at 8:8-9; 10:3-4.

[10] *Id.* at 8:9-14.

[11] *Id.* at 8:17-19.

[12] *Id.* at 8:20-21.

[13] *Id.* at 8:17; 8:25-9:1.

[14] *Id.* at 9:24-10:1; 10:7-10.

[15] *Id.* at 10:19-20; 57:14-15.

and to perform a traffic stop on Nguyen.[16] Along with the license plate information, Det. Miller explained the C.I.'s information to Det. Lynes and told him the driver of the Avalanche matched Nguyen's description.[17] Although Det. Miller had already run Nguyen's driving history and discovered his license had been revoked for driving under the influence, Det. Lynes also decided to run Nguyen's full history.[18] He discovered that, in addition to having his license revoked, (1) Nguyen was required to have an interlock device on his car to prevent drunk driving, (2) he was a suspect in a shooting around 2002, and, (3) a year prior, he had been involved in a foot pursuit where he fled from a vehicle that was subsequently seized along with a large sum of money.[19] Det. Lynes also ran the vehicle's information and confirmed the registration had been revoked and the vehicle was registered to Nicole Nguyen.[20]

Afterwards, Det. Lynes proceeded to the Rose Park Area to conduct surveillance from his police car.[21] After waiting under an hour to the east of the vehicle's reported location, he observed the Avalanche a block away driving west.[22] Det. Lynes followed and had to drive at a high rate of

---

[16] *Id.* at 9:23-24; 10:2-6; 18:23-25.

[17] *Id.* at 10:2-3, 21:18-20; 23:15-18.

[18] *Id.* at 9:2-9; 20:2-6.

[19] *Id.* at 10:9-19; 21:1-2. Det. Lynes testified that large sums of money are indicative of drug trafficking. *Id.* at 20:20-22.

[20] *Id.* at 22:21-23:2.

[21] *Id.* at 23:7-10.

[22] *Id.* at 23:13-14, 31:16-19.

speed to catch up to Nguyen.[23] While in pursuit, Det. Lynes was joined by Sgt. Marshall, a fourteen year veteran who was driving his own unmarked police car.[24] Sgt. Marshall ended up in front of Det. Lynes's vehicle, and he turned on his lights to initiate the stop as the Avalanche pulled into a gas station.[25]

Sgt. Marshall, whose car was five yards behind the Avalanche, and Det. Lynes, whose car was between eight to twelve yards behind the Avalanche, exited their police cars.[26] Det. Lynes testified he saw the driver "frantically moving around the cab area leaning towards the glove box."[27] Sgt. Marshall, who also saw the driver moving and reaching towards the passenger side of the vehicle, ordered the driver to show his hands.[28] Instead of showing his hands, "the Avalanche lunged forward about two feet."[29] Upon seeing this, Det. Lynes anticipated the driver was going to try to run, so he got back in his car.[30] Sgt. Marshall also thought the vehicle was attempting to flee and

---

[23] *Id.* at 23:23-25.

[24] *Id.* at 24:25-25:1-4; 43:13-14; 48:5-11. Det. Miller had previously contacted Sgt. Marshall about the investigation. *Id.* at 44:1-11.

[25] *Id.* at 25:18-25p; 45:9-10; 48:24.

[26] *Id.* at 26:4-8; 34:8-17.

[27] *Id.* at 26:8-9.

[28] *Id.* at 45:18-21.

[29] *Id.* at 26:21.

[30] *Id.* at 26:24-25.

repeated his command for the driver to show his hands.[31]  Nguyen was not compliant.[32]  Consequently, Sgt. Marshall opened the driver's side door, removed Nguyen, and passed him to Det. Lynes.[33]  Det. Lynes then put Nguyen in handcuffs for safety reasons.[34]  At one point, either as Nguyen was being removed or when Sgt. Marshall went back to check the rest of the car for occupants, Sgt. Marshall saw the Avalanche's glove box open and a large plastic bag sticking out of the void between the glove box and the dash.[35]  From his viewpoint, however, he could not see any controlled substances in the bag.[36]

Within three minutes of the initial stop,[37] Det. Johnson arrived with his dog, Jango.[38]  Det. Johnson was a seventeen year veteran who had been a Canine Officer for four years as well as an instructor for the State of Utah's Canine Program.[39]  To become a Canine Officer, Det. Johnson had to spend four months training for eight hours a day, five days a week.[40]  To remain certified, Det.

---

[31] *Id.* at 45:23-24.  Sgt. Marshall thought he spoke in a voice loud enough that the driver could hear even if the windows were up.  *Id.* at 46:14-16.

[32] *Id.* at 46:4.

[33] *Id.* at 27:14-16; 45:25-46:1; 51:5-6; 51:12-13.

[34] *Id.* at 27:16-18.

[35] *Id.* at 51:20-52:7.

[36] *Id.* at 52:15-17.

[37] Det. Lynes testified the average traffic stop lasts for fifteen to twenty minutes.  *Id.* at 39:10-11.

[38] *Id.* at 28:22-29:1; 56:1-7.

[39] *Id.* at 54:12-13; 54:21-23.

[40] *Id.* at 54:24-55:4.

Johnson has had continual ongoing training.[41] Jango, Det. Johnson's certified drug dog, received a standard Utah P.O.S.T. canine drug dog certificate and had "countless hours of ongoing in-service training and initial training" along with undergoing annual re-certification.[42] At the time of the stop, Jango and Det. Johnson had been partnered for approximately four years and worked together hundreds of times.[43] Although Jango always acted according to his training, Det. Johnson estimated that roughly two percent of the time Jango had indicated when there were no drugs present.[44]

Once he arrived, Det. Johnson first conducted a safety sweep of the Avalanche to ensure Jango's safety.[45] Afterwards, he directed Jango to do an exterior sniff of the vehicle, whereupon Jango alerted on the front seam of the passenger's side front door.[46] Based on his training, experience and the numerous times he had deployed Jango, Det. Johnson knew Jango indicated to the odor of a narcotic substance.[47] Furthermore, during the exterior sniff, Det. Johnson was able to look into the Avalanche and see a plastic bag that appeared to be partially pushed up behind the glove box.[48]

---

[41] *Id.* at 55:5.

[42] *Id.* at 56:10-16; 61:15-24.

[43] *Id.* at 56:18-22.

[44] *Id.* at 56:23-25; 66:5-8.

[45] *Id.* at 58:11-13.

[46] *Id.* at 58:13-14; 58:17-18.

[47] *Id.* at 58:19-22.

[48] *Id.* at 59:1-9. During the search, Det. Lynes glanced inside the Avalanche but was unable to see the plastic bag. *Id.* at 30:17-19.

Det. Johnson then opened the door to the vehicle and commanded Jango to search inside.[49] Once inside, Jango gave an aggressive indication on the glove box, communicating that he had pinpointed the smell of a narcotic he had been trained to find.[50] Whereupon, Det. Johnson pulled Jango out of the vehicle and told the other Detectives that Jango had indicated at the glove box.[51] While searching the glove box area, Det. Johnson found a vacuum sealed bag containing 976 ecstasy pills, which he turned over to Det. Lynes.[52] Det. Lynes then found ten more pills stored in a black bag or case in the cab area of the Avalanche.[53]

## ANALYSIS

**I.   STANDARD FOR A MOTION TO SUPPRESS**

"The government has the burden of demonstrating that the seizure 'it seeks to justify on the basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"[54] The court, however, "must avoid unrealistic second-guessing of police officers' decisions in this regard."[55] Further, the court should "allow[] officers to draw on

---

[49] *Id.* at 59:17-18.

[50] *Id.* at 59:19-23. While conducting the canine search of the exterior and interior of the vehicle, Det. Johnson used all the training procedures he had learned for using a trained drug dog. (Tr. at 60.) In addition, Jango did not alert on any other part of the vehicle. (Tr. at 65.)

[51] *Id.* at 59:25-60:2.

[52] *Id.* at 29:25-30:4; 60:4-5.

[53] *Id.* at 38:3-10.

[54] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[55] *Id.* (quotations and citations omitted).

their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[56] Once the government produces evidence to support the reasonableness of the officers' actions, the burden then shifts to the defendant to prove the evidence should be suppressed.[57]

## II.    STANDING

One who lawfully possesses or controls property has a legitimate expectation of privacy under the Fourth Amendment, and hence, has standing to contest a search and seizure.[58] Here, there is no indication the detectives considered the possibility that Nguyen did not lawfully possess or control the Avalanche. There also was no indication that the vehicle was stolen or that Nguyen did not have permission to drive the vehicle given the fact that (1) the C.I. informed Det. Miller that Nguyen drove an Avalanche,[59] (2) the Detectives knew that the Avalanche was registered to a person with the same last name as Nguyen, and (3) the Detectives knew the vehicle was registered at a known address of Nguyen. Further, the police never asked Nguyen to provide proof of ownership or to provide any other similar documentation, which indicates the Detectives never put lawful possession at issue. Consequently, the court finds that Nguyen had an expectation of privacy and, hence, has standing to challenge the search and seizure.

---

[56] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations and citations omitted).

[57] *United States v. Clarkson*, 551 F.3d 1196, 1200 (10th Cir. 2009) (citation omitted).

[58] *See generally United States v. Arango,* 912 F.2d 441 (10th Cir. 1990) (explaining that the issue of standing is approached under the rubric of the Fourth Amendment).

[59] Det. Miller showed the C.I. a picture of an Avalanche to confirm that was the type of vehicle Nguyen drove.

**III.    TRAFFIC STOP**

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[60] "A routine traffic stop is indisputably a seizure within the meaning of the Fourth Amendment."[61] To determine if a stop is reasonable, the first inquiry is "whether the stop was justified at its inception by either probable cause to believe a traffic violation had occurred or reasonable articulable suspicion the driver committed a traffic violation."[62]

Here, Det. Miller and Det. Lynes ran the license plate of the Chevy Avalanche and found the registration was revoked. Utah law states that "a person may not operate . . . a motor vehicle . . . in [Utah] . . . unless it has been registered in accordance with this chapter [or] Title 41, Chapter 22, Off-Highway Vehicles."[63] When Nguyen drove the Avalanche out of the Rose Park Area, he was operating a vehicle in violation of Utah Law. Hence, whether or not they were aware Nguyen was the driver, Sgt. Miller and Det. Lynes were justified in initiating a traffic stop of the Chevy Avalanche based on probable cause that a traffic violation had occurred.[64]

---

[60] U.S. Const. amend. IV.

[61] *United States v. Pena-Montes*, No. 08-2169, 2009 U.S. App. LEXIS 26567, at *8 (10th Cir. Dec. 7, 2009) (citation omitted).

[62] *Clarkson*, 551 F.3d at 1201 (citation omitted).

[63] Utah Code Ann. § 41-1a-201 (West 1992).

[64] It should be noted, at the time of the stop, Nguyen's driver's license was revoked. Also, the Avalanche did not have an interlock device, which Nguyen was required to use when operating a motor vehicle. Therefore, because Sgt. Miller and Det. Lynes had a reasonable articulable suspicion that Nguyen was the driver, they could reasonably conduct a traffic stop on that basis as well. Ultimately, Nguyen was only charged for the illegal drugs and not the traffic violations. Although he was not charged for the traffic violations, this does not negate the fact that the observed violations

## IV.  INVESTIGATORY DETENTION

An officer may extend a traffic stop "if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."[65] When evaluating whether an officer had reasonable suspicion of criminal activity, "the evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*."[66] "The level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or [the level of suspicion] required for probable cause."[67] The suspicion may also be premised on conduct which is not illegal by itself but, in combination with other facts, gives rise to an articulable suspicion a crime has occurred.[68]

Here, a confluence of factors resulted in a reasonable suspicion that a crime occurred. First, Det. Miller relayed information from an informant that Nguyen was involved in selling ecstasy pills and would be in the Salt Lake City Rose Park Area with 1000 ecstasy pills in a Chevy Avalanche. Later, in the same location the C.I. said the vehicle would be, Det. Miller observed a Chevy Avalanche belonging to a person with the same last name as Nguyen and registered to an address associated with Nguyen. Moreover, Det. Miller had independent corroboration from a Deputy

---

constituted a lawful basis for instituting the traffic stop.

[65] *Clarkson*, 551 F.3d at 1201 (citation omitted).

[66] *United States v. Velazquez*, No. 08-3318, 2009 U.S. App. LEXIS 22743, at *5-6 (10th Cir. Oct. 16, 2009) (citation omitted).

[67] *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2007) (quotations, citation, and alteration omitted).

[68] *United States v. Wisniewski*, 192 Fed. Appx. 749, 755 (10th Cir. 2006) (citations omitted).

-11-

United States Marshall that Nguyen was involved in selling ecstasy.

Nonetheless, even without the independent corroboration, Det. Miller reasonably relied on the C.I.'s information. Within the span of a year and a half, the C.I. provided information that led to convictions on four separate occasions. Further, Det. Miller ensured there were no miscommunications between the C.I. and himself. He found a picture of the type of vehicle Nguyen supposedly drove and showed it to the C.I. to confirm the make and model. He also printed a picture of Nguyen and showed it to the C.I. for a positive identification.

Second, as Sgt. Marshall and Det. Lynes exited their police cars, they both witnessed "frantic" movement towards the glove box area of the car. Third, the car lunged forward as the officers exited their police cars and both officers, who have twenty-two years of experience between them, thought the driver was attempting to flee. Fourth, when he glanced into the car, Sgt. Marshall was able to see a plastic bag sticking out of the void between the glove box and the dash, which is an unusual storage area.

The move towards the glove box, the lunge forward, and the location of the plastic bag, taken alone might not justify an investigatory detention. However, when the three factors are coupled with the C.I.'s information, the level of suspicion required for reasonable suspicion is met. In addition, Det. Johnson arrived on the scene three to five minutes after the stop was initiated. Because the vehicle was going to be impounded for lack of registration, the stop was not improperly extended beyond its appropriate duration. Hence, the investigatory detention along with the exterior sniff of the vehicle by Jango was justified.

## V.     PROBABLE CAUSE FOR INTERIOR SEARCH

The Fourth Amendment allows police to search an automobile where there is probable cause

to believe contraband or evidence is contained within.[69] The Tenth Circuit "has consistently held that probable cause can be based on alerts by trained dogs."[70] However, in order for an alert to support probable cause, the dog must be reliable or trained.[71] In addition, "[a] party seeking to suppress evidence bears the burden of proving the dog is unqualified."[72]

Here, Jango's alert provided the necessary probable cause to search the interior of the Avalanche. Jango is a trained and reliable drug dog. Jango received standard Utah P.O.S.T. canine drug dog certification and numerous hours of in-service training and initial training. In addition, during the hundreds of times Det. Johnson worked with Jango, Jango always acted according to his training. In fact, Det. Johnson testified that Jango only falsely alerted around two percent of the time. Further, Det. Johnson is a qualified and experienced drug dog handler able to interpret his dog's signals. Not only is he a canine officer but he is also an instructor for the State of Utah's Canine Program. Nguyen argues that the government failed to provide evidence that Jango had been trained to detect ecstasy and, therefore, his alert should not be accepted as evidence of probable cause. The argument misses the point. The officers were not required to find probable cause for the presence of ecstasy, only probable cause of the presence of a controlled substance. Further, Nguyen has provided no evidence to refute Jango's qualifications or reliability. He therefore has failed in his burden to prove Jango was unqualified. Hence, when Jango alerted on the front seam of the passenger's side front door, there was enough probable cause to search the interior of the Avalanche.

---

[69] *Clarkson*, 551 F.3d at 1202-03.

[70] *Id.* at 1203 (quotations and citation omitted).

[71] *Id.*

[72] *Id.*

## CONCLUSION

The court concludes that (1) Sgt. Marshall and Det. Lynes properly initiated the traffic stop, (2) properly extended the traffic stop, and (3) had the requisite probable cause to search the interior of Nguyen's vehicle. Therefore, the court DENIES Nguyen's Motion to Suppress.[73]

DATED this 15th of June, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[73] Docket No. 15.